Opinion
FIDLER, J.*
Case History
Appellant was charged in a 12-count information with five counts of violating Penal Code[1] section 266h, subdivision (a) (pimping), five counts of violating section 266i, subdivision (a) (pandering by procuring), and one count of violating section 266i, subdivision (a)(2) (pandering by encouraging). The information was eventually amended to consolidate two of the *376 pandering counts. Before trial, two counts of pandering were dismissed in the interest of justice, leaving nine counts to be tried.
Prior to trial a number of motions were heard and denied by the trial court, including a motion to dismiss (§ 995), a motion to suppress evidence (§ 1538.5), and a motion to recuse the district attorney’s office (§ 1424). The section 1538.5 motion was renewed during trial and again denied.
After a trial by jury, appellant was convicted of three counts of violating section 266h, subdivision (a). The jury deadlocked on the remaining counts, which the court eventually dismissed. After denying a motion for a new trial, the court denied appellant’s request for probation and sentenced her to the low term in state prison, three years as to count I. Appellant received concurrent terms on the two remaining counts, III and IX. This appeal followed.
Statement of Facts
Viewed in accordance with the usual rule of appellate review (People v. Rodriguez (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618]), the evidence at trial established the following: Lianne “Lee” Doversola, testifying under a grant of immunity, first met appellant in July of 1997 concerning possible employment with appellant’s “service.” Doversola was familiar with appellant’s service. Doversola told appellant she would be willing to perform sex acts for money. Appellant told Doversola she would earn $1,000 for a two-hour appointment and the split would be 60 percent for Doversola and 40 percent for the appellant.
During the next two-year period appellant arranged appointments for Doversola with appellant’s clients. These meetings took place both in and out of Los Angeles County. Eighty to eighty-five percent of these appointments involved some sort of sex. Appellant received her share of Doverso-la’s earnings either in person or by mail.
Pursuant to a grant of immunity, April White testified that she met appellant in May of 1998. Appellant told White she could make appointments for White with appellant’s clients and White would have sex with them in exchange for money. The split would be 60 percent for White and 40 percent for appellant. White was told the rules she would be expected to follow and how to send appellant her share of the proceeds. Appellant arranged for White to meet a client of hers in order to have sex in exchange for $1,000. White had sex with the client, but was only paid $500, of which appellant was paid a portion. During the next year, appellant set up White *377 with clients. Approximately 80 to 95 percent of these appointments involved sex in exchange for money. White sent appellant her share of the money. These appointments took place both inside and outside of Los Angeles County. Before each meeting, appellant told White the date, time and location of the client, as well as the client’s sexual preferences. White testified that she felt forced into some situations by appellant, and that appellant had expanded White’s prostitution activities.
Based upon an anonymous tip, the Los Angeles Police Department (LAPD) began an undercover investigation into appellant’s “agency,” California Dreamin’. LAPD Officer Cynthia Neff contacted the agency on September 24, 1998, in an undercover capacity, posing as an individual named “Taylor” and “Candice” or “Candy.” Appellant originally held herself out as “Sherry,” the secretary to the agency’s owner, “Sasha.”
Appellant and Neff met on October 1, 1998. Officer Neff was wearing recording equipment. Appellant explained the agency’s rules to Neff and told her never to negotiate money with its clients as it would not be romantic. Neff was told how to ship appellant’s part of the prostitution proceeds to her. Officer Neff was told to bring condoms on her assignments and that all assignments would require sex. The split of proceeds would be 60 percent for Neff and 40 percent for appellant.
In early February of 1999, Kimberly King met with the appellant. King told appellant her name was “Candy Hill.” Pursuant to a grant of immunity, King testified that appellant offered to hire her for her “agency.” Appellant told King what the rules were, what her rate would be ($500 an hour) and what the split would be (60 percent for King, 40 percent for appellant). King worked for the appellant for a number of months, both inside and outside of Los Angeles County. Not all of the jobs required King to have sex with the client. When King was late with appellant’s share of the money, appellant told King that bounty hunters would collect the money. King had not been a prostitute before going to work for appellant, although she had been an actress in adult films.[2]
On March 18, 1999, Officer Neff again met with appellant. Neff was again wearing a recorder. Appellant told the officer that appellant could provide her with jobs all over the country. Appellant told Neff the price for an “appointment” was $1,000 per hour, $3,000 for overnight, $5,000 for anything over two hours and $2,000 an hour for anal sex. In late March 1999, appellant left Officer Neff several messages in order to see if she was available for out-of-state jobs.
*378 At her meeting with appellant in March 1999, Officer Neff told appellant that Neff had a client she wanted to introduce to appellant. It was the LAPD’s plan to introduce Detective Razmig Kertenian as the client. On April 1, 1999, Detective Kertenian called California Dreamin’, and left a message, posing as an individual by the name of “Robert Agopian.” Appellant returned the call and arranged to have Lianne Doversola meet Kertenian at the Century Plaza Hotel for a rate of $1,000 for two hours. Appellant then called Doversola and arranged the meeting.
Doversola met with Detective Kertenian at the hotel. After some conversation Doversola had the detective remove all of his clothes.[3] She then reached for his groin area, at which time he stopped her and engaged her in more conversation. Doversola then took off her clothes and retrieved a condom from her purse. Detective Kertenian told her he was enjoying her beauty and their conversation and they should leave it at that. They arranged to meet in Denver the following week. Doversola then provided Kertenian with her full name and telephone number and suggested that he call her directly, thereby bypassing appellant. Doversola told Kertenian that he would save the 40 percent Doversola paid the appellant. Kertenian paid Doversola $1,000, from which she paid appellant $400.
On April 26, 1999, Kertenian spoke to appellant and told her he was very pleased with Doversola. They spoke about a future job involving Kertenian and a few of his friends, one of whom wanted a girl who would engage in anal sex. Appellant indicated she had a girl who would engage in anal sex and the charge was $2,000 an hour.
On May 10, 1999, appellant left a message that she had three women ready for Kertenian. On June 1, 1999, Kertenian left appellant a message that he wanted to hire two women and had a business proposition for appellant. Appellant returned the call and Kertenian told appellant he wanted to hire two women. He also told appellant he wanted her to send women to Kuwait, and they agreed upon a minimum price of $30,000 per week per woman. Further details of the Kuwait deal were to be worked out at a meeting set for June 8, 1999.
Appellant telephoned April White and arranged to send her on a call. Appellant told White there would be another woman on the job with her. On June 2, 1999, appellant left Detective Kertenian a message that she had two women ready to meet him on June 8, and that she wanted to meet Kertenian on the same date to discuss future jobs. On June 3, 1999, appellant left a message reiterating that the two women would be available on June 8, 1999, *379 and inquiring if Kertenian was paying for both women. Kertenian left a message for appellant on June 7 indicating his hotel and room number.
On June 8, 1999, Kertenian and his fellow undercover officer Shoukry Ethnasios occupied two rooms in the Century Plaza Hotel. The rooms were across from each other. They were met by two of appellant’s employees, “Kelly” (Aliza Scherer) and “Bethany” (April White). They all gathered in Detective Kertenian’s room, where Kertenian handed “Kelly” $2,000, which the women split in the bathroom. “Kelly” remained with Kertenian, while “Bethany” went with Ethnasios to his room. After Ethnasios removed his clothes, “Bethany” grabbed his penis. Ethnasios told her to wait until they got to Kuwait to have sex. The officer then let backup officers into the room and “Bethany” was detained.
Kertenian and “Kelly” conversed in his room, with “Kelly” asking Kerte-nian what he would like. After a time, Kertenian brought backup officers into the room. Kelly was detained. Officers recovered $1,400 from “Kelly” and $600 from “Bethany.”
Kertenian then met with appellant, at which time she was arrested. A search of her purse yielded an electronic organizer containing Kertenian’s undercover name and number.
Appellant was staying in a room at the Airtel Plaza Hotel in Van Nuys. Pursuant to a search warrant, police recovered copies of appellant’s “agency’s rules,” her date book containing the names of Doversola, White and King, and an entry that read, “Lee to Robert Agopian (Candice) $1,000 - $400.” The police recovered other evidence that clearly linked the appellant to the previously mentioned call girls and officers Neff and Kertenian.
Pursuant to another search warrant, appellant’s Palo Verde residence in Imperial County was searched. The police recovered numerous items which linked appellant to various call girls, the California Dreamin’ Web site, and Detective Kertenian.
Detective Keith Haight was shown a typewritten manuscript found at the appellant’s hotel as well as a handwritten manuscript found at appellant’s residence. These manuscripts concerned prostitution activities. He opined that both were consistent with pimping and pandering and that one of the manuscripts was also a “trick-book.” Haight used these manuscripts in forming his opinion that appellant was involved in pimping and pandering.
The defense offered no evidence at trial.
*380 Contentions on Appeal
1. The affidavit for the search warrant of appellant’s residence was insufficient. Further, appellant was entitled to an evidentiary hearing regarding the officers’ “good faith” concerning the search warrant for her residence.
2. The trial court’s admission into evidence of the manuscripts recovered from appellant’s residence and hotel room was error.
3. The trial court improperly instructed the jury on “pimping by solicitation.”
4. The trial court improperly refused to instruct the jury on the lesser-included or lesser related charge of aiding and abetting prostitution.
5. The mandatory minimum sentence for pimping constitutes cruel and unusual punishment.
I

The Information in the Warrant Was Not Stale and No Evidentiary Hearing Was Required

Appellant argues that the search warrant for her residence should not have been issued because the affidavit contained no information showing she was still residing there on June 7, 1999, when the warrant was issued. The last police surveillance linking appellant to the Palo Verde residence had taken place in January of 1999.
There must be probable cause to. believe that the material sought to be seized will be on the premises to be searched when the warrant is served. (People v. Mesa (1975) 14 Cal.3d 466, 470 [121 Cal.Rptr. 473, 535 P.2d 337].) The general rule is that information that is remote in time may be deemed to be stale and therefore unreliable. (Alexander v. Superior Court (1973) 9 Cal.3d 387, 393 [107 Cal.Rptr. 483, 508 P.2d 1131].)
However, the question of staleness depends on the facts of each case. Having granted the Attorney General’s request for judicial notice, we have reviewed the affidavit in support of the search warrant. It reveals that between October of 1998 and January of 1999, law enforcement surveillance of the appellant established her residence at the address that was the subject of the search warrant. The surveillance established appellant’s customary *381 residence at the Palo Verde house and occasional travel to the Airtel Plaza Hotel to conduct business.
There was no reason to believe the appellant had moved. Appellant continued her pattern of traveling to the Airtel Plaza Hotel. The magistrate was presented with ample evidence of a continuing criminal enterprise. (See People v. Mikesell (1996) 46 Cal.App.4th 1711, 1718 [54 Cal.Rptr.2d 708].) It was entirely reasonable for the magistrate to conclude that in light of all the known facts, appellant’s residence had not changed in the preceding five to six months. In fact, the manuscripts recovered from appellant’s residence and hotel, discussed post, contain references to making it difficult for the police to be able to find the author’s residence and true phone numbers.
Appellant argues that information was omitted from the warrant which would have cast doubt, on where appellant lived. This allegation is based on the following facts: In March of 1999, the trial court issued a search warrant, which among other things, sought items such as utility bills and phone numbers at the Palo Verde residence, which would have shown current use of the residence by the appellant. Based upon arguments made at the section 1538.5 hearing, this warrant did not yield any new information concerning appellant’s current use of the Palo Verde residence. No information showed appellant did not live there.
Appellant now argues that in their affidavit to the June warrant, the police were required to include their inability to obtain any new information confirming that appellant resided at the Palo Verde address. Appellant also contends that she was entitled to a hearing pursuant to Franks v. Delaware (1978) 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667], which the trial court denied. The appropriate procedure for evaluating the necessity of a Franks hearing was set forth in People v. Avalos (1996) 47 Cal.App.4th 1569, 1581 [55 Cal.Rptr.2d 450], as follows: “In Franks v. Delaware[, supra,] 438 U.S. 154. . . , the Supreme Court held a criminal defendant could challenge the veracity of an affidavit used to procure a search warrant where a showing is made the affidavit included a deliberate or recklessly made material factual misrepresentation or omission. But ‘[t]o mandate an evidentiary hearing, the challenger’s attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Allegations of negligence or innocent mistake are insufficient. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a *382 finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled ... to his hearing. Whether he will prevail at that hearing is, of course, another issue.’ (Id. at pp. 171-172 [57 L.Ed.2d at p. 682].) ‘When material information has been intentionally omitted from a warrant affidavit, the proper remedy is to restore the omitted information and reevaluate the affidavit for probable cause. [Citations.]’ (People v. Sousa (1993) 18 Cal.App.4th 549, 562-563 [22 Cal.Rptr.2d 264].)”
Here, the allegedly omitted information added nothing to the case. The magistrate was aware that no specific information linked appellant to the Palo Verde residence after January of 1999. The omitted information neither adds to nor detracts from the known state of facts. Even if the omitted information is added into the affidavit, probable cause still exists to show that appellant resided at the Palo Verde residence in June of 1999, as we have discussed, ante. The trial court correctly denied a Franks hearing.
II

The Trial Court Properly Admitted the Two Manuscripts

The police seized two manuscripts pursuant to the warrants issued in this case. They recovered a typewritten manuscript from appellant’s hotel room and a handwritten one from her home. Each was written in the first person and each described operating a prostitution enterprise. Detective Haight testified that the manuscripts were consistent with a pimping and pandering operation. (See Statement of Facts, ante.)
There was no evidence presented that appellant actually wrote or typed either manuscript, nor were any fingerprints obtained from either document. The trial court found that because of where the manuscripts were recovered, there was circumstantial evidence the appellant possessed them. The trial court also found that due to their contents the manuscripts were “tantamount to an admission or confession of sorts,” and that the People were entitled to use them to show appellant was a madam. The trial court also found the manuscripts were admissible to show appellant’s state of mind as to whether she was acting as a madam.[4]
Defense counsel conceded that he would not argue that appellant was not a madam, only that she was not as to the prostitutes mentioned in the information. In fact, defense counsel argued to the jury they could find that appellant was a madam.
*383 Appellant argues that the manuscripts were improperly admitted because they were not adequately authenticated pursuant to Evidence Code sections 1401-1421, citing People v. Price (1991) 1 Cal.4th 324 [3 Cal.Rptr.2d 106, 821 P.2d 610]. The Price case merely states a document must be properly authenticated. Evidence Code section 1410 provides: “Nothing in this article shall be construed to limit the means by which a writing may be authenticated or proved.”
The law is clear that the various means of authentication as set forth in Evidence Code sections 1410-1421 are not exclusive. Circumstantial evidence, content and location are all valid means of authentication (People v. Olguin (1994) 31 Cal.App.4th 1355, 1372-1373 [37 Cal.Rptr.2d 596]; Young v. Sorenson (1975) 47 Cal.App.3d 911, 915 [121 Cal.Rptr. 236]). We have taken judicial notice of and examined the manuscripts. There are clear references to the author being “Sasha,” one of appellant’s aliases. The evidence clearly showed that appellant was operating as a madam, that the manuscripts discussed the prostitution business, and that the locations where these items were seized were each a residence of appellant. Moreover, no evidence showed that these items belonged to anyone else. Therefore the manuscripts were properly authenticated.
Appellant also claims that in admitting the manuscripts, the trial court did not understand or exercise its discretion within the meaning of Evidence Code section 352. This contention is based upon the following comments of the trial court in discussing the manuscripts. “If he brings in evidence that, after reviewing it and considering it I believe is admissible under different theories, I don’t have any choice.”
Appellant overlooks the context of the court’s remarks. Only moments before this comment was made, the trial court had specifically excluded evidence pursuant to Evidence Code section 352. When read in context it is clear the trial court was not only aware of its duty but in fact exercised it. Having found no basis to exclude what the trial court deemed to be admissible evidence, including by inference on Evidence Code section 352 analysis, the court was bound to admit the evidence.
We find the trial court was aware of and exercised its discretion pursuant to Evidence Code section 352 and for the reasons set forth, ante, properly admitted the manuscripts. Even if it had been error to admit them, given the clear testimonial evidence of appellant’s status as a madam, any such error would have been harmless. (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)
*384 m

Appellant Was Not Denied Due Process by the Trial Court Instructing the Jury in the Entire Language of Section 266h, Subdivision (a)

Section 266h, subdivision (a) reads in pertinent part as follows: “[A]ny person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person’s prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, is guilty of pimping . . . .” (Italics added.)
At the close of the preliminary hearing, appellant’s counsel argued that the evidence was insufficient to show a violation of the first part of the statute in that appellant had received any money. The prosecution argued that they had established a violation of the second part of the statute, namely solicitation.
When the information was filed, and in each subsequent amendment, the People did not set forth the portion of the statute dealing with solicitation.
Appellant now argues, as she did at trial, that she was denied due process because she had no notice the People were relying on the solicitation component of section 266h, subdivision (a) and did not defend against that charge.
In People v. Vetri (1960) 178 Cal.App.2d 385, 393 [2 Cal.Rptr. 795] (a case involving § 266h, subd. (a)), the court set forth what is required in order to guarantee a defendant has adequate notice of the charges against him: “ ‘Section 952, which formerly required the pleading to set forth the particular circumstances of the offense charged, as amended, declares that it shall be sufficient if it be “in any words sufficient to give the accused notice of the offense of which he is accused.” There, in a nutshell, is stated the principle of our present simplified form of pleading a criminal offense—the accused is entitled to notice of the offense of which he is charged but not to the particular circumstances thereof, such details being furnished him by the transcript of the testimony upon which the indictment or information is founded.) (People v. Beesly [(1931)] 119 Cal.App. 82, 85-86 [6 P.2d 114, 970]; People v. Braddock [(1953)] 41 Cal.2d 794, 799 [264 P.2d 521].) ‘Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); defendant is entitled to such transcript under section *385 870 (or § 925) of the Penal Code.’ (People v. Roberts [(1953)] 40 Cal.2d 483, 486 [254 P.2d 501]; People v. Yant [(1938)] 26 Cal.App.2d 725, 730 [80 P.2d 506].)”
In the instant matter, the evidence presented at both the preliminary hearing and at trial clearly gave the appellant adequate notice of the charges against her, which included all acts proscribed by section 266h, subdivision (a). The prosecutor specifically argued both aspects of section 266h, subdivision (a) at the end of the preliminary hearing, as well as during the section 995 motion. Although we do not condone what appears to be careless pleading by the prosecution, we find no detriment to the appellant.
IV

The Trial Court Was Not Required to Instruct the Jury as to the Lesser Included Offense of Aiding and Abetting Prostitution

Appellant alleges the trial court had a duty, as requested by appellant, to instruct the jury that “aiding and abetting prostitution” was a lesser included charge to section 266h, subdivision (a), insofar as that section prohibits solicitation. Appellant offers no support for this proposition, other than to recite the general rule that “a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]” (People v. Birks (1998) 19 Cal.4th 108, 117-118 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) The trial court must instruct on lesser included offenses, even absent a request or over a party’s objection, “if there is substantial evidence [that] the defendant is guilty only of the lesser [offense].” (Id. at p. 118, italics added.)
At the outset we note there is no crime of aiding and abetting prostitution. In connection with prohibiting prostitution as a form of disorderly conduct, section 647, subdivision (b) states: “A person agrees to engage in an act of prostitution when, with specific intent to so engage, he or she manifests an acceptance of an offer or solicitation to so engage, regardless of whether the offer or solicitation was made by a person who also possessed the specific intent to engage in prostitution. No agreement to engage in an act of prostitution shall constitute a violation of this subdivision unless some act, in addition to the agreement, is done within this state in furtherance of the commission of an act of prostitution by the person agreeing to engage in that act. As used in this subdivision ‘prostitution’ includes any lewd act between persons for money or other consideration.” Aiding and abetting *386 makes one liable as a principal for the crime committed. (See CALJIC No. 3.00.)
A person is liable as an aider and abettor when (1) with knowledge of the unlawful purpose of the perpetrator and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, that person (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime. (CALJIC No. 3.01; People v. Beeman (1984) 35 Cal.3d 547, 560-561 [199 Cal.Rptr. 60, 674 P.2d 1318].)
More importantly, our Supreme Court has made clear that pimping and solicitation for prostitution are intended to be different categories of crimes. In People v. Smith (1955) 44 Cal.2d 77, 80 [279 P.2d 33], the court stated: “It is therefore reasonable to assume that only those acts which are of a more serious nature than the mere solicitation of a customer were intended to be declared felonies by section 266h.” (Italics added.)
We note that the solicitation component of section 647, subdivision (b) requires a specific intent (People v. Norris (1978) 88 Cal.App.3d Supp. 32, 38 [152 Cal.Rptr. 134]; CALJIC No. 16.420), while a violation of section 266h, subdivision (a) requires only a general intent. (People v. McNulty (1988) 202 Cal.App.3d 624, 629-631 [249 Cal.Rptr. 22].)
Finally, as is clear from our discussion of the facts, ante, the evidence showed appellant derived support from the earnings of prostitutes, received compensation for the solicitation of prostitutes, and solicited compensation for the solicitation of prostitutes. The appellant failed to show she is only guilty of what she perceives to be a lesser offense. The only possible offense she committed was that of pimping. Therefore the trial court correctly refused to instruct the jury as to any possible lesser offense.
V

Appellant’s Mandatory Minimum Three-year Sentence Does Not Constitute Cruel and/or Unusual Punishment

Appellant’s last contention is that her mandatory minimum three-year sentence constitutes cruel and/or unusual punishment under both the Eighth Amendment of the United States Constitution as well as article I, section 17 of the California Constitution.
In order to determine whether a sentence constitutes cruel and/or unusual punishment, we turn to our Supreme Court’s decision in In re Lynch *387 (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921]. Lynch sets forth the factors to consider in analyzing a particular penalty to determine whether that penalty is so disproportionate to the crime as to constitute cruel and/or unusual punishment.
(1) “[T]he nature of the offense and/or the offender, with particular regard to the degree of danger both present to society”;
(2) Comparison of the challenged penalty with penalties imposed in the same jurisdiction for different offenses which “must be deemed more serious” under the same standards used to assess the nature of the offense and the offender; and
(3) Comparison of the penalty with punishments prescribed for the “same offense in other jurisdictions.” (In re Lynch, supra, 8 Cal.3d at pp. 425-427, italics omitted.)
As to the first part of the first prong set forth in Lynch, various Courts of Appeal have unanimously decided there is no constitutional violation in regards to the nature of the offense. Section 266h, subdivision (a), was designed “to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute’s operation or increasing the available supply of prostitutes. [Citation.]” (People v. McNulty, supra, 202 Cal.App.3d at p. 632.)
As to the second part of the first prong, the record reveals the appellant to be a sophisticated, experienced madam, with a business that reached across the United States and was attempting to expand internationally. Her illegal and high-priced business affected many people. In addition, she was not above making threats to ensure she received her share of the proceeds of the prostitution enterprise she conducted. Appellant’s sentence is not grossly disproportionate to her culpability.
Turning to the second prong of Lynch, we must examine the minimum mandatory sentence imposed for pimping with the penalty imposed in California for other crimes. Appellant argues that section 1203.065 allows the possibility of probation, in the interest of justice, for various crimes involving serious sexual offenses, i.e., sections 261, 286, subdivision (k), 288a, subdivision (k), 220, 264.1, 288, subdivision (b) and 289.
We note the opening section of 1203.065, subdivision (b) which makes probation a possibility only “in unusual cases where the interests of justice *388 would best be served if the person is granted probation.” (Italics added.) Even if section 266h, subdivision (a), were included in this section, we are unpersuaded that appellant’s case would be considered unusual or that the interests of justice would compel probation.
We also take note of the cases cited in People v. McNulty, supra, 202 Cal.App.3d 624, People v. Madden (1979) 98 Cal.App.3d 249 [159 Cal.Rptr. 381], and People v. Main (1984) 152 Cal.App.3d 686 [199 Cal.Rptr. 683] for the proposition that cases without any violence or with sympathetic defendants can be subject to mandatory sentences without such sentences becoming cruel and unusual punishment.
Appellant also points to section 653f, as to the penalties for solicitation of other types of crimes. We are unpersuaded. The Legislature clearly had in mind preventing individuals from encouraging others to engage in prostitution, or receiving compensation for their doing so, in setting the penalties for section 266h, subdivision (a). We find the comparison between the sections unconvincing.
The final prong of Lynch mandates that we compare punishments between California and other states.
As People v. McNulty, supra, 202 Cal.App.3d 624, notes, California’s punishment for pimping is not the most severe in the United States, and is not grossly excessive or disproportionate when compared to other states. (Id. at p. 634.) Based upon the United States Supreme Court’s decision in Harmelin v. Michigan (1991) 501 U.S. 957, 965 [111 S.Ct. 2680, 2686, 115 L.Ed.2d 836], it is questionable whether any proportionality review is necessary for a noncapital case.
We are satisfied that although the trial court discussed the possibility of probation for the appellant but for her ineligibility for probation, her sentence is not so out of proportion to the offense that judicial intervention is required in order to prevent a violation of the rule against cruel or unusual punishment. (People v. Dillon (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697].) We find that appellant’s sentence violates neither the Eighth Amendment of the United States Constitution nor article I, section 17 of the California Constitution. We find that the appellant was fairly tried and that her sentence is appropriate for the crimes of which she was convicted.
*389 Disposition
The judgment is affirmed.
Klein, P. J., and Kitching, J., concurred.

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

All further statutory references hereinafter will be to the Penal Code unless otherwise noted.

King, Doversola and White all testified that appellant directed each of them to send appellant her share of the proceeds in a Fed-Ex box marked “Photos—Do Not Bend.”

Kertenian had been given permission by LAPD to do this.

Detective Haight testified males are referred to as pimps, females as madams.